[No. 6,512.—Department One.]

# A. B. PRESTON *v.* G. E. CULBERTSON.

CONTEST OF ELECTION—AMENDED COMPLAINT OR STATEMENT—RELATION—
LIMITATION OF ACTION.—In the contest of an election the "statement" or
complaint (Code Civ. Proc. § 1115) omitted to allege the date of the
"return-day" of the election, but afterwards an amended complaint was
filed wherein the "return-day" was alleged as of a date more than forty days
prior to the filing of the amended complaint, but less than forty days prior
to the filing of the original complaint.

*Held,* that the amended complaint, as it did not allege a cause of action against
any new party, related to the commencement of the contest, and was
therefore not open to the objection that it was filed more than forty days
after the "return day."

ID.—COMPLAINT OR STATEMENT—PLEADING—JURISDICTION—PRACTICE.—
*Held,* further, that § 1115, Code of Civil Procedure, does not require
that the written "statement" or complaint shall show by averment that
it has been filed within the forty days; and that the objection that the
complaint has not been filed within the statutory time, is therefore a
matter of defense to be made by answer in the nature of a plea to the
jurisdiction, or to be taken advantage of by motion to dismiss the pro-
ceeding.

ID.—QUALIFICATION OF VOTER—NATURALIZATION—COURT OF RECORD—
REGISTRY.—Upon the trial of the contest evidence was admitted by the
Court to show that three registered voters were not citizens of the United
States, and the Court so found:

*Held,* that the evidence was admissible; that with reference to two of the
voters the evidence of naturalization was suspicious, and the finding of
the Court should not be disturbed; and in the case of the third—it ap-
pearing from the certificate introduced, that he had been naturalized in
the Police Court of New Bedford, a Court having a clerk and seal, and
for aught that appeared common law jurisdiction—that the Court erred
in rejecting his vote.

ID.—PLACE OF VOTING—IRREGULARITY.—The polls for the J—— precinct
were opened a short distance from and in plain view of the place
appointed by the Supervisors—the owner of the house selected having
objected to the election proceeding at his house—but it did not appear
that any voter was misled or deprived of his vote by reason of the change:
*Held,* that the Court did not err in refusing to reject the vote of the
precinct.

ID.—IRREGULARITY.—The important question in election cases is, Have the
qualified electors been deprived of a fair opportunity of expressing their
preference ?  Mere irregularities which do not affect the final result,
should be disregarded.

ID.—BOUNDARY—VIEW OF PREMISES BY THE JUDGE.—T. voted in A——
precinct, and the question was as to the location of the boundary between
that and another precinct with reference to T.'s residence, and the Court
found that he voted illegally.

*Held,* the record not clearly showing the location of the line, and it appearing that the Judge below, with the consent of the parties, visited the locality, that the finding should not be disturbed.

ID.—RESIDENCE—FRAUD—HOMESTEAD.—The fact that a voter residing in J—— precinct had taken up a homestead claim elsewhere and left his real residence once a week or so to visit his homestead " in order to comply with the homestead laws," or to pretend compliance with them, tended to show an intended fraud upon the United States; but did not estop him from claiming his real residence for the purpose of voting.

ID.—MISNOMER—NOTICE OF ILLEGAL VOTERS.—The names of certain parties claimed to be illegal voters—as the same appeared in the Great Register—were Elias Newton Twist, Christian Herr, Thomas Pender Pool, Patrick White, William John Hunt, Colwell Owens Drew, and Louis Dewart Gobin, and the names appearing in the notice (under § 1116, Code Civ. Proc.) served upon the opposite party were E. N. Twist, Christian Herr, Thomas P. Pool, Pat. White, W. J. Hunt, C. O. Drew, and L. D. Gobin, and the Court found that the latter were the abbreviated names of the former, and that defendant was not surprised by the production of the witnesses, but was fully informed in respect to the persons who were charged to have voted illegally: *Held,* that the notice was sufficient.

ID.—RESIDENCE—FINDINGS—SUFFICIENCY OF EVIDENCE.—The findings of the Court with reference to the residence of various voters: *Held,* not to be unsustained by the evidence.

APPEAL from a judgment for the plaintiff in the County Court of Tuolumne County. REDMOND, J.

The bill of exceptions contained, among others, the following assignments of errors on the part of the defendant:

The Court erred in the cases of Charles Mayhew, Richard Clamp, and George Anderson, who were naturalized citizens and on the Great Register, wherein it decided that it could go behind the registration of voters, and take evidence as to when and where they were naturalized, and to determine if they were properly on the Great Register. This Court has no jurisdiction over the subject of the registration of voters. The District Court alone has jurisdiction over that subject.

The Court erred as to Clamp in its conclusions of law, in deciding that he was not a citizen of the United States at the time he voted at said election; whereas the law arising from the facts proven by the evidence shows, that he was a citizen and a legal voter.

The Court erred in deciding that George Anderson was an illegal voter, and that his vote should be taken from

the other legal votes cast for the defendant. That the decision is contrary to the evidence and against law, and the evidence is insufficient to sustain or justify the decision of the Court, in this: That the evidence shows that the said Anderson was a naturalized citizen and on the Great Register. That he was naturalized in New Orleans about thirty years ago. That after he came to California, in 1876, he desired to pre-empt some United States land, and had lost his naturalization papers. That he was informed that he could not make proof and payment without declaring his intention a second time; and for the purpose of making proof and payment for land in the Land Office, he did take out his declaration to become a citizen a second time in 1876. The Court decided that not having been naturalized since 1876, said Anderson was not a legal voter. The decision is contrary to the evidence and law, and the evidence is insufficient to sustain or justify the decision, in this: That the law arising from the facts proven by the evidence shows, that said Anderson was a legal voter and a citizen of the United States.

The Court erred in deciding that Patrick White was an illegal voter, and that his vote should be taken from the other legal votes cast for the defendant, and the decision is contrary to the evidence and law ; and that the evidence is insufficient to sustain or justify the judgment, in this: That said White, as shown by the evidence, at the time of the election had no fixed home or residence. That he temporarily placed his wife at Chinese Camp Precinct until he could provide a home for her; and that, during the time his family stayed there, he never intended to make it his permanent home or residence. That he worked and hired out wherever he could get work, from place to place, during the time his family were at Chinese Camp Precinct. That, prior to the election, he had been working in the Garrote Precinct some forty or fifty days, and that he voted in said Garrote Precinct. The decision is contrary to law, in this: That he had no residence in the Chinese Camp Precinct prior to the election; and if he had a right to vote at all, it was in the Garrote Precinct, where he was at work and where he resided forty or fifty days before the election.

The Court erred in deciding that John Kent was a legal

voter and that his vote should be counted for plaintiff, A. B. Preston. The decision is contrary to the evidence and law, and the evidence is insufficient to sustain or justify the decision of the Court, in this: That the evidence shows, that the witness, Kent, had been married over two years prior to the election, and that, at the time of marriage, his wife had a residence and home of her own at Poverty Hill, in the Jamestown Precinct. That, prior to his marriage, he resided in the Montezuma Precinct, where he was the owner of a house. That, in about two weeks after he was married, he went to live with his wife at Poverty Hill, in the Jamestown Precinct; and that his wife and family have ever since resided in that place. That witness has never provided any other place of residence or home for his family. That he lived there with them until about two or three months before the election, at which time, leaving his wife and family at Poverty Hill, he went to Montezuma and remained there until the election, and voted there at the election. The evidence and the law arising from the facts proven by the evidence show, that his residence was at Poverty Hill, in the Jamestown Precinct, at the time of the election, and that his vote was an illegal vote and should have been deducted from the legal votes cast for plaintiff.

The Court erred in deciding that William Schmedes was a legal voter, and that his vote should be counted for A. B. Preston. The decision is contrary to the law and the evidence, and the evidence is insufficient to sustain or justify the judgment of the Court, in this: That the evidence shows, that the said Schmedes was living near Ward's Ferry, with his family, on some public land of the United States, which had been improved by a former husband of said Schmedes' wife, and which the wife of the said Schmedes desired to pre-empt for the benefit of herself and children by a former husband. That the said Schmedes and his family had been living there three months prior to the election, which place is not in the Jamestown Precinct. That prior to going to live at Ward's Ferry, he lived in the Jamestown Precinct; had a house and a home there. That he went to Ward's Ferry, with his family, to hold their pre-emption claim good until he could prove up on it, and while he was living there he considered that his

residence. The evidence and the law arising from the fact proven by the evidence show, that the residence of the said Schmedes was at Ward's Ferry, which was not in the Jamestown Precinct, where Schmedes voted, and shows the vote of said Schmedes was an illegal vote, and should have been deducted from the other legal votes cast for plaintiff.

The Court erred in deciding that James Le Fevre was a legal voter and that his vote should be counted for A. B. Preston. The decision is contrary to the evidence and the law, and the evidence is insufficient to sustain or justify the decision of the Court, in this, That the evidence shows, that, prior to coming to Tuolumne County, Le Fevre resided in San Francisco, and was on the Great Register in San Francisco, and was not on the Great Register in Tuolumne County. That he voted in the Jamestown Precinct for Supervisor, but had been in Tuolumne County but twenty-eight or twenty-nine days prior to the election, and that his registration in San Francisco had never been canceled. The evidence and the law arising from the facts as proven by the evidence show, that the vote of the said Le Fevre was an illegal vote, and should have been deducted from the other legal votes cast for the plaintiff.

The Court erred in refusing to admit in evidence the certificate of the Registrar of Voters of the City and County of San Francisco, showing that said Le Fevre was a registered voter in said city and county, and that said registration had not been canceled.

That the Court erred in deciding that Manuel Francis was a legal voter and that his vote should not be deducted from the other legal votes cast for plaintiff. The decision is contrary to the evidence and the law, and the evidence is insufficient to sustain or justify the decision of the Court, in this: The evidence shows, that, prior to the election the witness had preëmpted some land, under the United States law, outside of the Jamestown Precinct; and that, at the time of the election he was still keeping up his preëmption, but had not made proof and payment. The evidence also shows, that he voted in Jamestown Precinct. The evidence and the law arising from the facts proven by the evidence show, that the residence of the said Francis, at the time of the election, was on,

said preëmption claim, and that his vote was an illegal vote, and that his name is not on the Great Register.

The Court erred in deciding that Thomas Porrin Woodruff was a legal voter and that his vote should be counted for A. B. Preston. The decision is contrary to the evidence and the law, and the evidence is insufficient to sustain or justify the decision of the Court, in this, That the evidence shows, that, at the time of the election, he had preëmpted some land under the United States law, and was holding said preëmption at the time of the election, but had not made proof and payment; and that said land was not in the Jamestown Precinct where he voted. The evidence and the law arising from the facts proven by the evidence show, that this witness' residence was at his preëmption claim; and not in the Jamestown Precinct where he voted; and that his vote was an illegal vote, and should have been deducted from the other legal votes cast for the plaintiff.

The Court erred in deciding that the vote of Vincent Wooters was a legal vote, and that said vote should be counted for A. B. Preston. That the decision is contrary to the evidence and law, and the evidence is insufficient to sustain or justify the decision of the Court, in this : That the evidence shows that the said Wooters was a single man, and that since 1856 he had a home in the Jamestown Precinct, consisting of a house and garden. That about twenty months prior to the election he took a position as Superintendent of a mine in the Garrote Precinct, and remained there about twenty months. That, at the time he took said position as Superintendent of the mine, he leased his house and garden in the Jamestown Precinct. That on the 8th of August, 1878, he returned to the ranch in the Jamestown Precinct, which was still under lease; that he voted in the said Jamestown Precinct, and had not been in the Jamestown Precinct for thirty days prior to the election. The evidence and the law arising from the facts proven by the evidence show, that during the time that said Wooters resided at Garrote, his residence was in the Garrote Precinct, and that when he returned to the Jamestown Precinct he had not been in the said Jamestown Precinct thirty days prior to the election, and that the vote of said Wooters was an illegal

vote, and should have been deducted from the other legal votes cast for the plaintiff.

The Court erred in deciding that James Smith was a legal voter, and that his vote should be counted for plaintiff. That the decision is contrary to the evidence and the law, and the evidence is insufficient to sustain or justify the decision of the Court, That the evidence shows, that at the time of the election, this witness had preëmpted land under the United States laws, outside of the Jamestown Precinct where he voted. That, at the time of the election, he was keeping up said preëmption claim, and had not made proof and payment. That, at the same time, he claimed to reside at Jamestown, in the Jamestown Precinct; and that his vote was an illegal vote, and should have been deducted from the other legal votes cast for plaintiff.

The Court erred in deciding that the vote of William Sammon was a legal vote and that it should be counted for plaintiff. The decision is against the evidence and law, and the evidence is insufficient to sustain or justify the decision of the Court, in this, That the evidence showed, that the witness had homesteaded, under the United States law, land outside of the Jamestown Precinct where he voted, and that at the time of the election, he was keeping up said homestead; and that, if he ever finally obtained a patent from the United States for the land, he intended to make it his permanent home. That, some time prior to the election, he had been stopping in the Jamestown Precinct where he voted. The evidence and the law arising from the facts proven by the evidence show, that at the time of the election, the residence of the witness was at the homestead and not at the Jamestown Precinct where he voted; and his vote should have been deducted from the other legal votes cast for plaintiff.

The Court erred in deciding that the vote of Everard Sharrock was a legal vote and in counting said vote for plaintiff. The decision is contrary to the evidence and the law, and the evidence is insufficient to sustain or justify the decision of the Court, in this, That the evidence shows that the said Sharrock was employed as the keeper of the Shawmut Mine, which is not in the Jamestown Precinct where he voted. That he resided for three years prior to the election, and at the time

of the election, at the Shawmut Mine.    That prior to going to
the Shawmut Mine, he resided at the Jamestown Precinct at
Campo Seco; had a house there that he called his own; that
he is a widower; that at one time, when he was absent from
his house at Campo Seco, another party had taken said house
and converted it into a wagon-shed, but gave him the use of
another house instead, near the same place.    The evidence
and law arising from the facts proven by the evidence show,
that the witness, at the time of election, was a resident of the
Shawmut Mine, which is in the Chinese Camp Precinct, and
not in the Jamestown Precinct; and that the said Sharrock
was an illegal voter, and his vote should have been deducted
from the other legal votes cast for plaintiff.

The Court erred in deciding that Thomas Jefferson Nation
was a legal voter and that his vote should be counted for
plaintiff.    That the decision is contrary to the law and evi-
dence, and that the evidence is insufficient to sustain or justify
the decision of the Court, in this: That the evidence shows,
that the witness voted at the Algerine Precinct, and that he
is a single man, and that for thirty-five days before the elec-
tion, and at the time of the election, he resided in Sonora
Precinct, and that he claimed his home in Algerine Precinct.
That he owned no house or home there, but he had control of
a house in which he had lived the greater portion of three
winters.    That he left the house in April last, and has resided
in different places where he could get work since that time.
The evidence and the law arising from the facts proven by
the evidence shows, that the said Nation was a resident of
Sonora at the time of the election, and not of Algerine Pre-
cinct—the place where he voted—and that his vote was an
illegal vote and should have been deducted from the other
legal votes cast for plaintiff.

The Court erred in deciding that Elias Newton Twist was
an illegal voter and that his vote should be deducted from the
number of the legal votes cast for defendant.    The decision
is contrary to the law and the evidence, and the evidence is
insufficient to sustain or justify the decision of the Court, in
this: The Court decided that the question of which precinct
the house of Twist is in, can only be decided by drawing a
straight line from the north-west corner of his ranch, where it

is intersected by Long Gulch, to the nearest point on the Jacksonville road, which line will then become the dividing line between the Chinese Camp and the Algerine Precincts respectively. This line is not the line established by the Board of Supervisors as the dividing line between the two precincts. According to the description of the Chinese Camp Precinct, as described by the Board of Supervisors, the dividing line between the two precincts is the Jacksonville road leading from Latimer's ranch to the west side of Twist's ranch; and that, according to this line, Twist would be in the Algerine Precinct; and that he would also be in the Algerine Precinct according to the description of Chinese Camp as made by the Board of Supervisors of said precinct, which description also makes the line running from the west side of Twist's ranch to the Jacksonville road the dividing line of the two precincts. The evidence and the law arising from the facts proven by the evidence shows, that the said Twist, at the time of the election, was a resident of Algerine Precinct and was a legal voter, and that his vote should have been counted for the defendant. The Court further erred in deciding that the said ·vote was an illegal vote, in this, That the Court seems to have decided that the description of the precinct lines by the Board of Supervisors was so indefinite that they could not be traced, and that it was necessary to establish an arbitrary line in order to determine in which precinct the said Twist resided. This was an error; for if it could not be ascertained by the description of the precinct line of the Board of Supervisors in what precinct Twist resided, he would have a right to vote in either precinct in which he thought he resided and in which he claimed his vote.

The Court erred in deciding that the vote of John Simms was an illegal vote, and that his vote should be taken from the other legal votes cast for the defendant. That the decision is contrary to the evidence and the law, and the evidence is insufficient to sustain or justify the decision of the Court, in this: That the evidence shows, that the boundary line between Chinese Camp and Montezuma Precincts, established by the Board of Supervisors, is the line following down a road leading from Montezuma, by Simms' Dutch ranch, to Goodwin's. That the commencement of said line is a point

where the Chinese Camp District mining line intersects said road. That if said road be taken as the dividing line, Simms' would be in the Montezuma Precinct. That the Court evidently decided that some other line was the line between the two precincts. The evidence and the law arising from the facts proven by the evidence show, that Simms was a resident of Montezuma Precinct, and that his vote was a legal vote and should not have been deducted from the other legal votes cast for the defendant. It appears from the decision and findings of the Court, that the descriptions of the precinct lines, as given by the Board of Supervisors, were so indefinite that they could not be traced, and that he adopted an arbitrary line, the same as in the case of Twist, which was error; because, if the line was so indefinite that it could not be ascertained in which precinct Simms resided, he had a right to vote in either precinct in which he thought he resided and in which he claims his vote.

Plaintiff assigned as errors against him, among others, the following:

The ruling of the Court in sustaining the demurrer to the complaint.

The decision of the Court in deciding that Christian Herr is a legal voter, and in allowing and counting his vote in favor of defendant Culbertson.

*Caleb Dorsey,* for Appellant.

*E. A. Rodgers,* for Respondent.

The COURT:

This is a contested election, each of the parties claiming to have been chosen Supervisor in District No. 3, Tuolumne County.

Within forty days after the votes were canvassed, and defendant declared elected, plaintiff filed with the County Clerk his "statement." (Code Civ. Proc. § 1115.) He omitted to allege in it the date of the canvass—the "return-day." Defendant's general demurrer was sustained. Plaintiff, with leave of the Court, filed an amended complaint, wherein the return-day was alleged as of a date more than forty days

previous to the filing of the amended complaint, but less than forty days prior to the filing of the original complaint. The defendant demurred to the amended complaint on the ground that it appeared therefrom that it was filed more than forty days after the "return-day."

The amended complaint does not allege a cause of action against any *new party;* it relates to the commencement of the contest. Besides, § 1115, Code Civ. Proc., which provides for the requisites of the written statement or complaint, does not require that it shall show, by averment, that it has been filed within the forty days. That the complainant has not proceeded within the statutory time is, therefore, a matter of defense, to be made by answer in the nature of a plea to the jurisdiction, or to be taken advantage of by motion to dismiss the proceeding.

As to alleged errors of the Court below upon the recount:

First. It was not error to receive evidence with respect to the question whether Clamp, Mayhew, and Anderson were citizens of the United States. The inquiry was not simply whether they were registered, but whether they were, in other respects, qualified voters. If their names had not been registered they could not have voted; being on the register, the question of citizenship still remained. (*Webster* v. *Byrnes,* 34 Cal. 275.) The evidence as to the naturalization of Clamp was somewhat suspicious. He swore that he was naturalized in New York in 1847, but left his "papers" with a friend in that city when he left for California—in 1846. The fact that he "declared his intention" to become a citizen in Tuolumne County in 1875 was a circumstance which certainly tended to disprove his testimony that he had been previously naturalized. The Court below, as was its province, passed upon his credibility in view of all the surroundings—including his failure to remember the Court from which he received his final papers in New York.

Similar considerations, doubtless, influenced the decision of the Court in the case of Anderson, who, if his testimony is to be believed, "was naturalized thirty years ago" in New Orleans—and when he was less than eighteen years of age. He also had since "declared his intentions" in California.

In the case of Mayhew, however, the certificate introduced

proved that he had been naturalized in the Police Court of New Bedford; a Court having a clerk and seal, and for aught that appears, a common law jurisdiction. (Rev. Stat. U. S. § 2165.)

The Court below erred in rejecting the vote of Mayhew.

Second. There was evidence to sustain the finding that Gobin's residence was in Cloudman, and not in the Santa Maria Precinct, where he voted.

Third. There was evidence to sustain the finding with respect to 'Drew.

Fourth. The Court was justified in finding that the residence of White—his home and that of his family—was at Chinese Camp, and not at Garrote, where he voted.

Fifth. The Court did not err in denying defendant's motion to reject the vote of Jamestown Precinct. The polls were opened a short distance from and in plain view of the place appointed—the owner of the house selected having objected to the election proceeding at his house—and it does not appear that any voter was misled, or deprived of his vote, by reason of the change. In case of an election contest: "The investigation proposed is one in which the public at large are deeply concerned. It necessarily involves a question of broader import than the mere individual claim of a designated person to enjoy the honors and emoluments of the particular office brought directly in contest. The inquiry must be as to whether or not the popular will in the selection of officers to administer the public affairs has been, in a given instance, or is about to be, defeated or thwarted by mistakes happened or fraud concocted. It is, therefore, not an ordinary adversary proceeding, for, as against this high public interest concerned, there can be no recognized adversary." (*Minor* v. *Kidder*, 43 Cal. 237.) The important question in such cases is, Have the qualified electors been deprived of a fair opportunity of expressing their preference? Mere irregularities which do not affect the final result should be disregarded. (*Sprague* v. *Norway*, 31 Cal. 173.)

Sixth. The Court below held that Twist voted illegally in Algerine Precinct. The question was, where ran the boundary line between Algerine and Chinese Precinct, and in which

of these precincts did Twist reside ? As the case is presented in the transcript before us we can not reverse the decision of the Court below upon this question. The record does not clearly show the relative positions of the natural objects referred to in the testimony, so that we can intelligently determine where the line runs with reference to the house of Twist, or with reference to his lands, or to his inclosure, as the same existed when the line was established. The Judge below, with the consent of parties, visited the locality, and certainly had better opportunities for determining satisfactorily the question in dispute than have we.

Seventh. The remarks under the last subdivision apply to the case of Simms.

First. There was evidence to sustain the finding as to Kent.

Second. The Court should not have counted the vote of Schmedes for plaintiff. The evidence shows his residence to have been at Ward's Ferry. He and his family were there living upon a pre-emption claim. That he intended at some indefinite time in the future to remove to Poverty Hill, in Jamestown precinct, did not make the latter place his residence.

Third. Apparently the vote of Le Fevre should have been rejected. He had not been registered.

Fourth. There was a substantial conflict in the evidence with respect to the residences of Francis, Woodruff, and Smith. The finding as to them can not be disturbed by this Court.

Fifth. The Court should have rejected the vote (for plaintiff) of Wooters. He had rented his house, had removed to Garrote, had lived and been employed there more than twenty months, and did not return to reside at Jamestown until a day less than thirty days prior to the election.

Sixth. We can not set aside the finding that Sammon was entitled to vote at Jamestown. The facts that he had taken up a homestead claim elsewhere, and left his real residence, once a week or so, to visit his homestead " in order to comply with the homestead laws," or to pretend compliance with them, tended to show an intended fraud upon the United States. But they did not estop him from claiming his real residence for the purpose of voting.

Seventh. There was evidence to sustain the finding that

Sharrock and Nation were legally entitled to vote at Jamestown.

The result of the canvass by the Board of Supervisors was:

For A. B. Preston (plaintiff), two hundred and fifty-two votes.

For G. F. Culbertson (defendant), two hundred and fifty-four votes.

If we deduct from the aggregate number, allowed by the Supervisors to defendant, the votes of Clamp, Anderson, Gobin, Drew, White, Twist, and Simms—seven—there remains to be counted for defendant, the number two hundred and forty-seven.

And it we subtract from the aggregate counted by the Supervisors for plaintiff the votes of Schmedes, Le Fevre, and Wooters—three—there remain to be credited to plaintiff two hundred and forty-nine votes.

This result renders it unnecessary to inquire whether the vote for "Cubster" was improperly counted in the Court below for Culbertson, the defendant. It also renders it unnecessary to decide whether other objections taken by plaintiff to the action of the Court were well founded.

It is insisted by appellant that the Court below erred in permitting plaintiff to examine, as illegal voters, Elias Newton Twist, Christian Herr, Thomas Pender Pool, Patrick White, William John Hunt, Colwell Owens Drew, and Louis Dewart Gobin, on the ground that their names were not served on defendant in advance of the trial. The names served were E. N. Twist, Christian Herr, Thomas P. Pool, Pat. White, W. J. Hunt, C. O. Drew, and L. D. Gobin.

It would be difficult to distinguish between Christian Herr and *Christian* Herr, or, in view of the general familiarity with the abbreviation, to believe that it could have been understood that "Pat." (with a capital "P") stood for any other word than Patrick. But § 1116 of the Code of Civil Procedure only requires that the contestant shall serve a notice containing "the number of illegal votes, and *by whom* given." It does not, by fair construction, require that the names of the alleged illegal voters shall be written out in full on the list, although such would be the safer practice. The notice serves the object of the law if by it "three days before the trial" the

defendant is informed whose votes the plaintiff intends to attack. The Court below found, in effect, that defendant was not surprised by the production of the witnesses, but that he was fully informed in respect of the persons who were charged to have voted illegally. We can not see how he was injured. Judgment affirmed.