## JOHN W. HORTON *vs.* EDWARD M. SULLIVAN.

### APRIL 9, 1913.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1) *Elections. Boards of Canvassers.*

The action of boards of canvassers is judicial in its nature and their action in making up the voting lists is not reviewable in a proceeding to try the title to an office, but by *certiorari* alone.

(2) *Elections. Review. Boards of Canvassers.*

The action of a board of canvassers in placing the names of voters upon the voting list, is no bar to an inquiry by the court in a proceeding to try title to office, as to the qualifications of voters participating in an election.

(3) *Elections. Voters.*

In a proceeding to try title to office an illegal voter may be required to testify for whom he voted.

(4) *Elections. Voters.*

In a proceeding to try title to office a supervisor aiding an illegal voter may be required to testify for whom such voter cast his ballot, notwithstanding the prohibition of the statute, Gen. Laws, 1909, cap. 11, § 45, since "voter" in such case means legal voter.

*(5) Elections. Evidence.*

In a proceeding to try title to office, evidence offered by one claimed to be an illegal voter that he had been told by friends that his father was a voter, is hearsay and insufficient to establish the fact that the father was a voter and thus raise the presumption that he was a legal voter.

Petition in Equity under Chapter 328 of the General Laws to try title to office. Heard and dismissed.

Baker, J. This is a petition in equity, brought under the provisions of Chapter 328 of the General Laws, to determine as between the petitioner and the respondent the title to the office of Mayor of the city of Cranston, in the State of Rhode Island, as the result of an election held November 5th, 1912.

The petitioner concedes that the respondent was declared elected Mayor by the city council of said city and that said respondent has been duly sworn and engaged as incumbent of said office. He alleges, however, that enough illegal votes were cast for the respondent to change the result of said election and that except for the casting and counting of said illegal votes he, said petitioner, was elected Mayor of the said city of Cranston at said election.

The respondent files an answer, setting out in detail the proceedings of the board of canvassers of said city preliminary to as well as in the making up of the lists of voters of said city for said election; that the names of all said illegal voters at said election were on said voting lists and that the decisions, findings and determinations of said board of canvassers in and about the canvassing of said voting lists were judicial and conclusive as to the title of the respondent to said office of Mayor and only reviewable by this court by and through a writ of *certiorari*. He also makes a general denial of the truth of all the allegations contained in the petition not specifically admitted.

(1) The action of boards of canvassers is held to be judicial in its nature. *Weeden* v. *Town Council*, 9 R. I. 128; *Keenan* v. *Cook*, 12 R. I. 52; *State* v. *Congdon*, 14 R. I. 267. It is clear that the action of the boards of canvassers in making

up the voting lists is not reviewable in a proceeding of this character, but by *certiorari* alone, *Lennon* v. *Board of Canvassers*, 29 R. I. 329, 456.    This, however, is not a proceeding to purge the voting lists of Cranston and the court will now make no order in relation thereto.    This is a proceeding to try the title to an office and the question raised is whether or not the judicial action of the board of canvassers in making up the voting lists in any way limits the scope of the inquiry of this court in this proceeding.    In other words, is the action of the canvassers in placing a man's name on the voting list so far as this proceeding is concerned conclusive as to his right to vote as claimed by the respondent?    The effect of such action by a board of canvassers has been discussed in *State* v. *Congdon, supra.*    The court there says that these lists are "conclusive evidence of electoral qualification for moderators and wardens in the elections which follow next after they are made" and that the law does "not purport to make the list conclusive in any other matter or for any other purpose."    It was there urged "that the listing itself qualifies the voter or gives him the right to vote."    The court held this argument untenable, pointing out that the qualifications of voters are prescribed by the constitution and that it is utterly beyond the power of the General Assembly, either directly or indirectly, to alter, add to or abridge them. And further on it says: "In fact the listing, so far from giving the right, will not protect the voter, though it may enable him to vote, unless he is otherwise qualified."    If a person listed as a voter, although not qualified, is not protected from being punished criminally if he votes with knowledge of his lack of qualification, is it nevertheless to be permitted that his illegal and perhaps criminal vote shall be counted as valid simply on the ground that his being listed by the canvassers has rendered the question of his qualification as a voter *res adjudicata?*    Does public policy permit inquiry as to the lack of qualification of a voter notwithstanding his being listed for the purpose of his punishment, if ascertained, but allow no investigation with the intent of preventing his

illegal act having effect? That there can be inquiry in a criminal proceeding as to the qualification of a voter shows that the listing of a person as a voter is not conclusive as to his qualification as such.

In *Cannon* v. *Board of Canvassers,* 24 R. I. 473, 475, the court quotes Durfee, C. J., in *State* v. *Congdon, supra,* to the effect "that the determination is required by the statute for a particular purpose of temporary duration; it settled (2) no independent right." From all of which it appears that the canvassing and listing of voters by a board of canvassers at any particular time, while judicial acts, are limited in their scope and effect, having in point of time reference only to the election next following and being therefore temporary in character, and being conclusive as to electoral qualifications upon the election officers conducting said election. They can refuse the vote of no man on the list; they can receive the vote of no man not on the list. So far as the public is concerned as to any particular election said listing of voters is conclusive in that all persons not on the list, although qualified electors, cannot vote (*In re Polling Lists,* 13 R. I. 729), and in that all persons on the list may vote; but it is not conclusive as to the qualification of those on the list as voters. Therefore, not only do those on the list, not actually qualified, vote at their peril, but also the effect of their illegal voting may be rectified. Such action of a board of canvassers is accordingly no bar to a full inquiry in a proceeding like the present one as to the qualifications of voters participating in an election. And this view is well sustained by authority elsewhere. *State* v. *O'Hearn,* 58 Vt. 718; McCrary on Elections, 4th ed. Sec. 470; *Preston* v. *Culbertson,* 58 Cal. 198, 208; Thatcher's Criminal Cases, 593, 595; Cyc. Vol. 15, 307; 10 Am. & Eng. Ency. L. 773, n. 2.

It was also suggested, although little pressed, that a person voting at an election, although not qualified to do so, should not be permitted to testify for whom he voted. Upon grounds of public policy the legal voter cannot under our secret ballot laws be compelled to disclose for whom he voted,

but there is no good reason why an illegal voter should be thus protected. The rule is obviously in aid of the purity of the ballot and not for the protection of its corrupt use. It is well settled that the illegal voter may be required to testify for whom he voted. McCrary on Elections, Sec. 490, 492, 494; Paine's Law of Election, Sec. 776; Wigmore on Evidence, Vol. 3, Sec. 2216; Cyc. Vol. 15, 424, and cases cited. Therefore, during the hearing when it appeared that a witness had voted illegally in the election in question it was permitted to inquire for whom he voted. This rule was also applied once in a case of a supervisor aiding an illegal voter, notwithstanding the provisions of Section 45 of Chapter 11 of the General Laws, providing that in such case "such supervisor shall thereafter give no information regarding the same," as the court construed the word "voter" in said section to mean legal voter and that the prohibition would not apply to an illegal voter.

Now what are the facts as shown by the evidence? The petitioner offered testimony to show that fourteen unqualified voters had illegally voted for the respondent. The latter offered testimony to show that seventeen such voters had voted for the petitioner. It clearly appeared by the testimony that one of the seventeen, Thomas S. Hammond, was a qualified elector and that the other thirty were illegal voters. This fact was challenged as to Charles Limb. Both his father and himself were born in England. There was no evidence that either was ever naturalized. The father died some seven or eight years ago. The son testified that he had been told by friends that his father was a voter; that is hearsay and is clearly insufficient to establish the fact that the father was ever a voter and thus raise the presumption that he was a legal voter.

There was no serious objection raised by respondent as to the fourteen voters alleged by petitioner to have illegally voted for respondent except as to two and as to these we are of the opinion that in fact they did vote for respondent. As to eight of the sixteen illegal voters presented as witnesses

by the respondent, petitioner, while he does not concede that they voted for him, urges no good reason why their testimony that they did so vote is not to be accepted as true and we are of the opinion that their votes were cast for the petitioner, as they stated.

The petitioner claims that the other eight illegal voters produced by respondent as witnesses should, upon all the evidence in the case applicable to them, be found to have voted for the respondent, although they testify that they voted for the petitioner. We think that the evidence justifies such findings as to three of said eight; on the other hand we are of the opinion that three of the eight voted for the petitioner as they testified to doing. As to the other two it may perhaps be more difficult to draw a definite conclusion as to the person for whom they voted, but it is immaterial as to them what conclusion is reached as affecting the result of the election as will appear by the following: The vote as announced by the board of canvassers was: Mr. Sullivan, 1,892; Mr. Horton, 1,881. Deduct from Mr. Sullivan's vote the illegal fourteen votes shown by the petitioner and five out of the last group of eight and his corrected vote is 1,873; deduct from Mr. Horton's vote the eight practically not disputed and three of the last group of eight and his corrected vote is 1,870, which gives Mr. Sullivan three votes more than Mr. Horton. But if the two doubtful voters of the last group of eight be counted as having been cast for Mr. Horton, the corrected result is that Mr. Sullivan has 1,875, and Mr. Horton, 1,868, which gives Mr. Sullivan seven votes in excess of Mr. Horton. Our finding is therefore that the respondent received not less than three and not more than seven votes in excess of the total number of votes cast for the petitioner and that the respondent was duly elected Mayor of Cranston at said election.

The petition is therefore denied and dismissed.

*Edward D. Bassett, Cooney & Cahill,* for petitioner.

*Edwin C. Pierce, John P. Brennan, Francis E. Sullivan,* for respondent.